USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/11/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE WEIGHT WATCHERS INTERNATIONAL, INC.
SECURITIES LITIGATION,

14-cv-1997 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

>       Gregg S. Levin
>       David P. Abel
>       MOTLEY RICE LLP
>
>       Jonathan Gardner
>       Mark S. Goldman
>       Christine M. Fox
>       LABATON SUCHAROW LLP
>
>       *Attorneys for Plaintiffs*
>
>       Lynn K. Neuner
>       George S. Wang
>       Rae C. Adams
>       SIMPSON THACHER & BARTLETT LLP
>       *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

This putative class action concerns purchases of Weight Watchers International, Inc.

("Weight Watchers") stock between February 14, 2012 and February 13, 2013.  Plaintiffs assert

claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act")

and Rule 10b-5 thereunder based on alleged misstatements and omissions regarding the reasons for

a decline in Weight Watcher's business.  The matter is before the Court on a motion to dismiss the consolidated amended complaint.

*Facts*

*The Parties*

  *Plaintiffs*

    KBC Asset Management NV and Oklahoma Police Pension & Retirement System, which were designated lead plaintiffs on June 9, 2014,[1] allege that they "purchased the common stock of Weight Watchers at artificially inflated prices and ha[ve] been damaged thereby."[2]

  *Defendants*

    Weight Watchers is alleged to be the world's leading provider of weight management services.[3]  At all relevant times, its common stock has traded on the NYSE.[4]

    Defendant David Kirchhoff was Weight Watcher's president and chief executive officer from December 31, 2006 until July 30, 2013.[5]  He is alleged to have signed its quarterly and

---

[1]

  Order . . . Appointing KBC Asset Management NV and Oklahoma Police Pension & Retirement System as Lead Plaintiff (June 9, 2014) [DI 27].

[2]

  Consolidated Complaint [DI 37] ("Cpt.")  ¶¶ 14-15.

[3]

  *Id.* ¶ 16.

[4]

  *Id.*

[5]

  *Id.* ¶ 17.

annual SEC reports at all relevant times.[6]  Defendant Ann Sardini was Weight Watcher's chief financial officer from at least February 2012 until March 30, 2012.[7]

Artal Luxembourg, S.A., with its parents and subsidiaries (collectively, "Artal"), allegedly is, and at all relevant times was, the controlling shareholder of Weight Watchers, owning 51 percent of the outstanding shares of Weight Watcher's common stock.[8]  Raymond Debbane, Artal's chief executive officer, has been the chairman of Weight Watcher's board since September 29, 1999 and served on Weight Watcher's compensation committee at all relevant times.[9]

*Substantive Allegations*

In February 2012, Weight Watchers announced that it would conduct a modified Dutch auction tender offer to purchase $720 million worth of its common stock and would purchase from Artal an equal number of shares at a matching price to maintain Artal's ownership stake in Weight Watchers at a constant percentage.[10]  Investors then were informed that Weight Watchers' traditional meetings business had begun to decline, but the complaint alleges that defendants failed to disclose information about the "real reasons for that decline, reasons that meant that the decline

---

[6]      *Id.*

[7]      *Id.* ¶ 18.

[8]      *Id.* ¶ 19.

[9]      *Id.* ¶ 20.

[10]     *Id.* ¶ 2.

4

was likely to continue."[11]   In particular, the complaint alleges that defendants issued false and misleading statements regarding (1) the allegedly adverse competitive impact on Weight Watcher's business of free mobile applications ("apps"), (2) the disruption allegedly caused by the transition to a new software platform and (3) declines in meeting enrollment.  It asserts that the subsequent disclosures of Weight Watcher's decline in business and corresponding downward revisions of earnings guidance caused precipitous declines in its share price.

### *Alleged Deception Regarding the Competitive Impact of Free Mobile Apps*

The complaint alleges that the proliferation of free mobile apps that tracked food intake, exercise, and weight loss goals slowed Weight Watchers' growth rate, but that "[d]efendants repeatedly misled the market about the true impact the free apps were having on the Company's business."[12]  Specifically, the complaint relies on the following Weight Watchers statements during the alleged class period:

- "[W]e have been seeing online start-ups pop up actually for the past 10 years, so this isn't new per se. . . . [T]here's websites like SparkPeople that's now been around for a bunch of years.  It really hasn't had any impact that we can discern on our business. Apps that are now popping up on the iTunes store, they are out there but, again we can't see any discernable impact on our business."[13]

---

[11]     *Id.* ¶ 3.

[12]     Opp. [DI 48] at 14; Cpt. ¶ 19.

[13]     Cpt. ¶ 52.

- "[T]here's been a proliferation of free apps, but effectively, these apps – they're online calorie counters. What Weight Watchers is delivering is a much more comprehensive solution that operates on a lot of different levels."[14]

- "[W]e recognize . . . that the proliferation of so-called free apps has the potential to create additional pressure on our ability to recruit new people. Our plan is to overcome these challenges with major program improvements, as well as new marketing campaigns that allow us to rise above . . . and to create further differentiation in our offerings versus other alternatives."[15]

- "Here is my take on apps . . . they have obviously been out there for some period of time. Lots of people are downloading free apps. They are all over the place. There's lots of companies developing free apps. . . . The problem that I see with apps is that they're effectively calorie counters, and they're applications that make counting calories a little bit easier, but they're not based on an actual program. . . . [W]e believe that we're going to have a value proposition that is nowhere even close to being in the same place as a lot of these applications, which are much more narrowly defined."[16]

The complaint alleges that these statements were false and misleading because they failed to disclose that "it was growing increasingly difficult to convince dieters to pay for Weight Watchers' meetings and online subscription when there was an abundance of free apps" and that "the growth rate in the Company's online segment [therefore] was slowing down."[17] Moreover, plaintiffs allege that defendants misleadingly attributed Weight Watchers' failure to meet financial guidance to "execution issues in the small account portion of [its] corporate business" rather than to increasing competition from free apps.[18] Plaintiffs point to Weight Watchers's disclosure on

---

14      *Id.* ¶ 96.

15      *Id.* ¶ 104.

16      *Id.* ¶ 104; *see also id.* ¶ 91.

17      *Id.* ¶ 53(a)-(b).

18      *Id.* ¶ 77; see also *id.* ¶¶ 50, 75, 77-78, 86, 88-89.

February 13, 2013, in which Kirchhoff allegedly admitted that "[o]ver the past year, . . . there [had]

been an increase in proliferation of free applications," that there had been a significant increase in

consumer interest in them in January 2013, and that Weight Watchers' strategies had "started losing

some effectiveness roughly 6 months ago."[19]


*Alleged Concealment of Alleged Disruption from Software Platform Transition*

   The complaint alleges that the following statements were false and misleading:

- "[R]esults in the meetings business were . . . somewhat softer than our expectations. Most of our challenges in the meetings business were attributable to execution issues, which are now in the process of being addressed."[20]

- "[I]t has taken us longer to dig out of the hole we created for ourselves in the small account corporate business in the US.  Therefore, the impact to Q1 challenges will create pressure on our top-line results, and the remaining quarters of 2012, specifically in our meetings business. . . . As we move into the second half of this year, volume trends should stabilize in the meetings business, and we will continue to benefit from growing WeightWatchers.com volumes."[21]

- "The lower enrollment volumes were the result of the continued impact of execution issues in the small-accounts corporate business and weakness in the traditional meetings business beginning late in the quarter."[22]

   These allegedly were misleading because defendants failed to disclose "that the

Company's transition to a software platform called The Portal caused such a disruption in Weight

---

[19]     *Id.* ¶ 112.

[20]     *Id.* ¶ 75.

[21]     *Id.* ¶ 78.

[22]     *Id.* ¶ 86.

Watcher's . . . small accounts corporate division . . . , that it was materially affecting the Company's meetings business and would negatively affect overall meeting attendance for some time."[23]

### Declines in Enrollment

Finally, the complaint alleges that defendants failed to disclose that Weight Watchers was experiencing a material decline in its North American meeting attendance and, instead, "continually misled investors by claiming a return to growth was just around the corner."[24]  In particular, defendants contend that Kirchhoff statements forecasting "top line growth for the full year [of 2012] although the first quarter will be a tough comparable,"[25] and "forecasting Q1 2012 paid weeks declines in the mid-single digits, returning to growth by Q3 and into Q4 [2012]"[26] were false and misleading because there was "no legitimate basis to expect a turnaround in the Company's fortunes."[27]  Plaintiffs allege that this was because, in addition to the factors identified above, Weight Watchers' "online-only membership . . . was cannibalizing the Company's . . . meetings business."[28]  Plaintiffs allege that it was not until August 2012 that investors were told that

---

[23]     *Id.* ¶ 53(d).

[24]     DI 48 at 17-18.

[25]     Cpt. ¶ 47.

[26]     *Id.* ¶ 50.

[27]     DI 48 at 18.

[28]     Cpt. ¶ 53(c).

because "enrollment trends for the remainder of the year will be worse than we had originally forecasted . . . we are now forecasting high single-digit declines in attendances and paid weeks."[29]

*Discussion*

I.   *Legal Standard*

In evaluating a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded factual allegations and "draws all inferences in the plaintiff's favor."[30]  A court considers the complaint and "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[31]  But a plaintiff must nevertheless plead sufficient facts "to state a claim to relief that is plausible on its face."[32]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[33]

---

[29]      *Id.* ¶ 88.

[30]      *See Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 107 (2d Cir. 2012).

[31]      *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[32]      *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[33]      *Aschroft v. Iqbal*, 556 U.S. 662 (2009).

A Section 10(b) claim must satisfy also the heightened pleading standard for cases of fraud under Rule 9(b)[34] and the additional requirements imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA").[35] The PSLRA requires, among other things, that a complaint "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"[36] To recover for a violation of Section 10(b) and Rule 10b-5, a private securities plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[37]

---

[34] FED. R. CIV. P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake."); *ATSI Commc'ns Inc.*, 493 F.3d at 99 (stating that securities fraud cases are subject to Rule 9(b)).

[35] *ATSI Commc'ns Inc.*, 43 F.3d at 99 ("[P]rivate securities fraud actions must also meet the PSLRA's pleading requirements or face dismissal.").

[36] *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)); *see also* 15 U.S.C. § 78u-4(b)(1) (stating that a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed"); *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).

[37] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (internal quotation marks omitted); *see also ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) ("[T]o succeed on a claim, a plaintiff must establish that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with *scienter*, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." (internal quotation marks omitted)).

As this Court recently explained: "[T]here are two ways for a Section 10(b) plaintiff to state a legally sufficient claim that a defendant has made a material misrepresentation (i.e., a misstatement) or omission.  First, such a plaintiff can plead facts that, if true, would be sufficient to show that the defendant made an 'untrue statement of a material fact.' Second, the plaintiff can plead facts that, if true, would be sufficient to show that the defendant 'omit[ted] to state a material fact necessary' to make whatever statement(s) it made 'not misleading.'"[38]

Lastly, as the Supreme Court recently explained in *Omnicare*, and as will be discussed further below, where the allegedly fraudulent statements are statements of opinion or belief, a plaintiff must also "plead facts that, if true, would be sufficient to show one of two things: (1) if asserting that the statement of opinion or belief 'constitutes a factual misstatement' in itself, that the speaker did not 'actually hold[] the stated belief,' or (2) if asserting that the statement of opinion or belief is misleading due to the omission of 'discrete factual representations,' that the statement did not 'rest on some meaningful . . . inquiry,' rendering it 'misleading to a reasonable person reading the statement fairly and in context.'"[39]

---

[38]  *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 66 (S.D.N.Y. 2015) (quoting 17 C.F.R. § 240.10b-5(b)).

[39]  *Id*. at 13 (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, — U.S. —, 135 S. Ct. 1318, 1325-28, 1332 (2015)).

II.    *The Plaintiffs' Claims*

Plaintiffs' allegations center on Weight Watchers' allegedly misleading assurances that free mobile applications were not a significant competitive threat, that it was primed for growth, and that declines in enrollment were likely to turn around.[40]

A.    *Free Mobile Apps*

Plaintiffs allege that Weight Watchers made false and misleading statements regarding the competitive pressure it faced from free mobile apps.[41] Thus, Weight Watchers allegedly said that, while it recognized that free apps had "the potential to create additional pressure on [its] ability to recruit," it planned to adopt measures to overcome that challenge by focusing on the added value provided by its product as compared with the free apps.

The statement plaintiffs rely upon of course might imply that Weight Watchers, in substance, expressed the opinion that the measures it planned to adopt would offset any negative effect of the proliferation of free apps. But plaintiffs do not allege that the statement that the free apps had such a potential was false.[42] Nor do they dispute the truth of Weight Watchers' statements

---

[40]    Pl. Mem. [DI 48] at 1.

[41]    Cpt. ¶¶ 91, 96, 104.

[42]    They do allege that "the growth rate in the Company's online segment was slowing down" as a result of the free apps. Cpt. ¶ 53(a)-(b). The only alleged basis for this assertion is a number of rather vague statements attributed to confidential witnesses, including, for example, a conclusory claim that "Weight Watchers was feeling the effects of competition from free apps in 2011." *Id.* ¶ 54. But plaintiffs themselves allege that Weight Watchers substantially disclosed the fact that it was "feeling the effects of competition from free apps," whatever exactly that was supposed to mean. Plaintiffs indeed quote Weight

that it planned to adopt measures to focus on the additional value that Weight Watchers offered as compared with the apps. Thus, the essence of the claim based on these statements ultimately lies on Weight Watchers' opinion, whether stated explicitly or implied, that its intended differentiation of its own product from the free apps would offset the "potential . . . additional pressure" exerted by the apps.

As noted above, *Omnicare* requires a plaintiff who asserts that a statement of opinion or belief is an "*untrue statement* of a material fact" in itself to do more than allege that the underlying fact is false. Rather, such a plaintiff must plead facts that, if true, would be sufficient to show that the speaker did not "actually hold[] the stated belief."[43]  Similarly, a plaintiff who asserts that a speaker "*omit[ted]* to state a material fact necessary in order to make" its opinion or

---

Watchers public statements that the free apps had "the potential to create additional pressure on our ability to recruit new people" and that the company planned "to overcome these challenges with major program improvements . . . [and] marketing campaigns." *Id.* ¶ 54(a)-(b). Thus, on plaintiffs' own account, Weight Watchers publicly acknowledged that it was under pressure from free apps and was moving to counter them, which is not necessarily the same as the assertion that "the growth rate in the Company's online segment was slowing down." Moreover, none of the confidential witnesses upon whom plaintiffs rely was (a) in a position to have known whether growth in the online segment in fact was "slowing down," and (b) allegedly told plaintiffs' counsel that that is what took place during the relevant period. *Id.* ¶¶ 55-59.

[43]  *Omnicare*, 135 S. Ct. at 1326; *see also Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (noting that statements of opinion "not honestly believed when they were made" are actionable).

Unlike with statements of pure fact, it is of no importance that a "sincere statement" of opinion or belief "turn[s] out to be wrong." *Omnicare*, 135 S. Ct. at 1327. Where the speaker's opinion or belief is genuine, a bare allegation that her opinion or belief ultimately proved incorrect is not enough to survive a motion to dismiss after *Omnicare. Id.* ("[A] sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong."). Indeed, the securities laws do "not allow investors to second-guess inherently subjective and uncertain assessments;" they are not, in other words, "an invitation to Monday morning quarterback an issuer's opinions." *Id.*

belief not misleading "cannot state a claim by alleging only that [the] opinion was wrong."[44] "[A] statement of opinion is not misleading just because external facts show the opinion to be incorrect."[45] Instead, recognizing that statements of opinion or belief in some circumstances "are reasonably understood to rest on a factual basis that justifies them as accurate,"[46] a plaintiff who asserts that the defendant omitted to state a fact (or facts) necessary to make a statement of opinion or belief "not misleading" must "call into question the issuer's basis for offering the opinion."[47] But before explaining what a plaintiff must do to satisfy this standard, it is important to explain why the standard exists in the first place.

Rule 10b-5's "omissions clause . . . necessarily brings the reasonable person into the analysis, and asks what she would naturally understand a statement to convey beyond its literal meaning."[48] With respect to statements of opinion or belief, "that means considering the foundation she would expect an issuer to have before making the statement."[49] For example, in the context of "formal documents," like financial statements filed with the SEC, reasonable investors "do not, and are not right to, expect opinions contained in those statements to reflect baseless, off-the-cuff

---

[44]
    *Id.* at 1332.

[45]
    *Id.* at 1328, 1332.

[46]
    *Va. Bankshares v. Bankshares*, 501 U.S. 1083, 1093 (1991); *see also Weiss v. SEC*, 468 F.3d 849, 855 (D.C. Cir. 2006) ("Under the securities laws, a statement of opinion includes an implied representation that the speaker rendered the opinion in good faith and with a reasonable basis.").

[47]
    *Omnicare*, 135 S. Ct. at 1332.

[48]
    *Id.* at 1331-32.

[49]
    *Id.* at 1332.

judgments."[50]  Rather, they properly may assume that expressions of opinion contained therein "convey facts about how the speaker has formed the opinion" – *i.e.*, facts "about the speaker's basis for holding that view."[51]  Where they do not, such statements may mislead their audiences in violation of Rule 10b-5.[52]

What, then, must a plaintiff plead to state a legally sufficient claim that the defendant "omit[ted] to state a material fact necessary" to make its statement of opinion "not misleading?"[53] *Omnicare* holds that a plaintiff "cannot just say that the issuer failed to reveal [the] basis" for the opinion.[54]  Such a "conclusory assertion[]" may be enough to allege adequately that an omission has occurred, but it offers no reason to think the omission "rendered a published statement misleading."[55] Nor may the plaintiff merely "recit[e] . . . the statutory language" or offer bare "conclusory allegation[s]" that the issuer "lacked reasonable grounds for the belief it stated."[56]  Rather, the plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have –

---

[50]     *Id.* at 1330.

[51]     *Id.* at 1328.

[52]     *See id.*

[53]     17 C.F.R. § 240.10b-5(b).

[54]     135 S. Ct. at 1329.

[55]     *Id.* at 1332.

[56]     *Id.* at 1333 (internal quotation marks omitted).

whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."[57]

For these reasons, plaintiffs here were required to do more than merely allege that Weight Watchers' was wrong when it stated that free mobile applications were not having a significant impact on its business and that declines in small account revenue were due to "execution issues." Plaintiffs were obliged to allege sufficiently facts that, if true, plausibly could justify a conclusion that defendants either knew that their statements were false or, at least, that they had no reasonable basis for making them.[58]

Plaintiffs have attempted to do so through the use of confidential witnesses. Allegations based on statements of confidential witnesses may be credited on a motion to dismiss where they are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."[59] In addition, even if credited, the confidential witness statements relied upon must support the assertions based upon them. But that is not the case here.

---

[57]  *Id.* at 1332. Indeed, "whether an omission makes an expression of opinion misleading always depends on context," and the securities laws "create[] liability only for the omission of material facts that cannot be squared with" reading an expression of opinion "in its full context." *Id.* at 1330.

[58]  *Westland*, 2015 WL 5311196, at *12 (quoting *Omnicare*, 135 S. Ct at 1332) (plaintiffs "must identify particular (and material) facts going to the basis for the . . . opinion – facts about the . . . knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context").

[59]  *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).

The complaint relies first on alleged statements attributed to a vice president at advertising agency McCann Erickson, who allegedly believed that Weight Watchers faced challenges in keeping its mobile applications up-to-date with industry trends.[60] But the points for which plaintiffs rely upon him are that the growth rate in Weight Watchers' online business segment was falling and that the reason for the decline was competitive pressure from free apps. Yet the supposed McCann Erickson witness, so far as the complaint reveals, was not in a position to know whether the growth rate in that business segment was in decline. Nor is there any alleged basis for supposing that he could have done more than speculate as to the reason for any such drop.

Similarly, a territory manager at Weight Watchers who allegedly was responsible for tracking and reporting budgets and metrics on customer recruiting allegedly stated that the Weight Watcher's application was "not really competitive enough with what's out there" and concluded that Kirchhoff had not been forthright with investors about how that would affect the business.[61] But this witness, so far as the complaint discloses, did not say that the growth rate in the online segment was falling, even in his local territory, let alone across the company as a whole. Moreover, his alleged personal view that the company was not sufficiently competitive simply is not enough to support a claim that the company made any false or misleading statements.

Finally, neither of these alleged witnesses provided "discrete factual representations," to demonstrate that the company's statements did not "rest on some meaningful . . . inquiry."[62]

---

[60]   Cpt. ¶¶ 55-56.

[61]   *Id.* ¶ 59.

[62]   *Omnicare*, 135 S. Ct. at 1325, 1328.

Plaintiffs, therefore, have failed to state a claim that Weight Watchers' representations regarding free mobile apps were false or misleading.

B.    *Transitional Disruption from Software Platform*

Plaintiffs allege also that Weight Watchers made false and misleading statements by failing to disclose the alleged severity of disruption and impact on its small accounts division caused by a rocky transition to new software called The Portal.  As with the statements regarding the impact of free apps competition, the statements at issue here were statements of opinion, and plaintiffs again use alleged confidential witness statements in an attempt to demonstrate Weight Watchers' knowledge of the falsity of these statements or its lack of reasonable bases for them.

In this instance, plaintiffs use alleged statements of Weight Watchers corporate account managers.  These come closer than the statements regarding pressure from free apps, but they too fail to support an actionable claim for fraud.

A former corporate account manager allegedly stated that "members of the Company's management team" were aware that The Portal "was a complete disaster."[63]  That rather grandiose and hyperbolic assertion, however, is a characterization or opinion of the witness, not an objectively testable statement of fact.  One person's "complete disaster" is another's "setback" or "problem."  Moreover, the characterization appears to rest on the manager's personal observations of "many glitches and . . . technical problems" from the rollout as well as his attendance at a meeting

---

[63]    Cpt. ¶ 60.

with "top executives," possibly even Kirchhoff, at which problems with the Portal were discussed, certainly not necessarily adequate bases for the characterization.[64]

Another Weight Watchers corporate account manager allegedly stated that "the decision to keep the Portal in place went all the way to the top of Weight Watchers - to the former CEO Kirchhoff."[65] That manager too allegedly observed "system glitches" and allegedly recalled that "many of his corporate clients ultimately dropped Weight Watchers" as a result of those glitches.[66] But the observation of "system glitches" is not a sufficient basis for the accusation that the company lied about its view or that it lacked a reasonable basis for its statements of opinion. And the basis for their witness's purported knowledge as to the reasons why some clients dropped Weight Watchers is obscure – it could be statements of clients or the witness's speculation or an amalgam of both, leavened with industry gossip.

Had Weight Watchers claimed that there were no technical problems with The Portal, then factual assertions – to the limited extend they are factual rather than characterization, rhetoric, and hyperbole – accepted as true, could undermine the basis for the company's statements. But the complaint itself concedes that Weight Watchers informed the public of execution issues it encountered with The Portal. Rather, plaintiffs contend that "any disclosures [d]efendants may have made were rendered meaningless by their own statements downplaying the significance of the

---

[64]    *Id.* ¶¶ 60-62.

[65]    *Id.* ¶ 64.

[66]    *Id.*

problems."[67]  In other words, plaintiffs' claim rests on the allegedly false assurances that the system glitches were "in the process of being addressed" and that "volume trends should stabilize in the meetings business,"[68] not alleged statements that no such technical issues existed.  But these confidential witnesses have not provided any facts to suggest that either defendants did not actually believe (1) that the technical issues were being addressed or that volume trends would stabilize, or (2) those statements did not rest on a meaningful inquiry.

### C.    Declines in Enrollment

Lastly, plaintiffs allege that Weight Watchers' statements forecasting top line growth for 2012 – once again, a clear statement of opinion – were false or misleading because, in addition to the competition from mobile apps and rollout problems with The Portal discussed above, it knew that its online-only business was cannibalizing its traditional meetings business and that it was facing a "material decline" in traditional meeting attendance that would not be reversed until it updated its "PointsPlus diet plan."[69]  Thus, it argues, Weight Watchers lacked a reasonable basis for making this forecast.

Plaintiffs face several problems with these allegations.  As defendants correctly point out, "WWI's online business was launched in 2001 and represented nearly half of WWI's customers by 2011.  Given that this growth had been ongoing and the two businesses had co-existed for years,

---

[67]

DI 48 at 16.

[68]

Cpt. ¶¶ 75, 78.

[69]

*Id.* ¶ 53(c), (e).

it could not have been a new, undisclosed fact in February 2012."[70]  Plaintiffs fail also to provide any factual allegations to support the contention that online growth was driven by poaching traditional meetings clients.  Defendants correctly point out that it disclosed its enrollment trends in public SEC filings.[71]  Therefore, plaintiffs cannot demonstrate, as they are required to do, that Weight Watchers omitted material facts, without which the statement forecasting growth was misleading, with respect to either of these matters.

Plaintiffs have failed also to demonstrate how these two broad allegations, even if true and supported by sufficiently specific factual allegations, would have rendered the growth forecast unreasonable.  Indeed, plaintiffs themselves assert that the online business had significantly higher margins than the traditional business and that the margins for the online business continued to grow, while the margins for traditional business were in decline.[72]  Moreover, at the time of the allegedly fraudulent statements, online enrollment trends continued to grow.[73]  Therefore, even if the online business was cannibalizing customers from the traditional business and the traditional meetings business was in decline, plaintiffs have not here pled facts sufficient to demonstrate that this necessarily would be inconsistent with an optimistic growth forecast.

---

[70]

Defs.' Mem. [DI 45] at 14 n.10 (citation omitted).

[71]

*Id.* at 13.

[72]

Cpt. ¶¶ 45-46 ("Gross margins [for the online business] increased from 76% in 2005 to 87% in 2012 while operating margins expanded from 7% to 51% over the same period."); *id.* at n.9 ("Operating margins for the meetings business, on the other hand, have been steadily falling from 33% in 2003 to 19% in 2012.").

[73]

Defs.' Mem. at 13-14.

Defendants are correct to point out that there is nothing fraudulent about a disappointing year and that an actionable claim under Section 10(b) requires more.[74] To allege adequately that Weight Watcher's representations were misstatements of material fact, plaintiffs had to plead facts that, if true, would have been sufficient to show, assuming materiality, that Weight Watchers did not believe those representations or that those representations did not rest on a meaningful inquiry. Plaintiffs have not done so.

### Conclusion

Accordingly, defendant's motion to dismiss the consolidated amended complaint [DI 44] is granted.[75]

SO ORDERED.

Dated:        May 11, 2016

_____
Lewis A. Kaplan
United States District Judge

---

[74]   It is also likely, as defendants contend, that at least certain of the purported misstatements were protected forward-looking statements within the meaning of the PSLRA. *See* 15 U.S.C. § 78u-5(i)(1). It is unnecessary, however, to reach such an analysis at this time because plaintiffs have not adequately alleged material misrepresentations or omissions by defendants.

[75]   Plaintiffs assert also a claim against Kirchhoff, Sardini, Debbane and Artal for violations of Section 20(a) of the Exchange Act. Section 20(a) imposes liability on control persons for Exchange Act violations by those they control. 15 U.S.C. § 78t. As the complaint fails to plead an underlying violation of the Exchange Act, its allegations of control person liability under Section 20(a) fail also.